1
2
3
4
5
6
7
8           **UNITED STATES DISTRICT COURT**
9           **CENTRAL DISTRICT OF CALIFORNIA**
10

11   ANDY STONE, et al.,                    Case No. 2:23-cv-09216-MRA-JDE

12                    Plaintiffs,           **ORDER GRANTING DEFENDANTS'
                                            MOTION FOR SUMMARY
13        v.                                JUDGMENT [ECF 68], DENYING
                                            PLAINTIFFS' MOTION FOR
14   MARIAH CAREY, et al.,                  SUMMARY JUDGMENT [ECF 69],
                                            AND GRANTING DEFENDANTS'
15                    Defendants.           MOTION FOR SANCTIONS [ECF 74]**
16
17
18

19          Before the Court are Defendants' and Plaintiffs' Motions for Summary Judgment

20   and Defendants' Motion for Sanctions.  ECF 68, 69, 74.  The Court read and considered

21   the moving, opposing, and reply papers and held a hearing.  ECF 80.  For the reasons stated

22   herein, the Court **GRANTS** Defendants' Motion for Summary Judgment and Motion for

23   Sanctions and **DENIES** Plaintiffs' Motion for Summary Judgment.

24   I.     **BACKGROUND**

25          On November 1, 2023, Plaintiffs Andy Stone, whose stage name is Vince Vance,

26   and Troy Powers filed this copyright infringement action against Defendants Mariah Carey

27   ("Carey"), Walter Afanasieff ("Afanasieff"), Sony/ATV Tunes LLC, Sony Entertainment,

28   Kobalt Music Publishing America, Inc., Universal Music Corporation, and Wally World

Music LLC (collectively, "Defendants").  ECF 1.  In the operative First Amended Complaint ("FAC"), Plaintiffs allege that they co-authored in 1988 and released in 1989 a musical composition entitled "All I Want for Christmas Is You" ("*Vance*"), in which they purportedly own copyright interest.  ECF 31 ¶¶ 5, 6, 18.  In 1994, Defendants Carey and Afanasieff co-authored and released a musical composition by the same name ("*Carey*") to great commercial success.  *Id.* ¶¶ 31, 35, 37-45.  Plaintiffs allege that Carey and Afanasieff had access to *Vance* prior to writing and releasing *Carey* and copied *Vance*'s lyrics, compositional structure, chord progression, melody, and harmony.  *Id.* ¶¶ 29-30, 32, 34, 48, 49, 59.  On these allegations, Plaintiffs bring a single claim of direct copyright infringement.  *Id.* ¶¶ 60-70.

On February 2, 2024, Defendants filed an unopposed Motion for an Order Establishing an Initial Expert Phase as to the Extrinsic Test.  ECF 41 through ECF 45.  In their Joint Rule 26(f) Report, the parties agreed that the principal issue in this case is "whether [*Carey*] and [*Vance*] are substantially similar under this Circuit's extrinsic test for substantial similarity in protected expression."  ECF 46 at 4.  Consistent with Defendants' Motion, the parties stipulated to an initial phase of expert discovery as to the extrinsic test and stay of all other discovery.  *Id.* at 6.  The parties also agreed that this discrete, dispositive issue should be decided by motions for summary judgment.  *Id.* at 6-7.  On March 8, 2024, the Court granted the request and issued its Order establishing an initial expert phase as to the extrinsic test (the "Bifurcation Order").  ECF 53.  The Court ordered the parties to exchange initial and rebuttal expert disclosures and complete expert discovery as to the extrinsic test and, upon completion of expert discovery, to file a joint status report advising whether any party intended to file a motion for summary judgment.  *Id.* at 3.  The Court stayed all other discovery.  *Id.*

Pursuant to the Court's Bifurcation Order, the parties completed expert discovery as to the extrinsic test.  Defendants designated Dr. Lawrence Ferrara and Prof. Nathaniel Lewis as their experts and served initial and rebuttal reports from both experts.  *See* ECF 68-3 (Ferrara Decl.) ¶¶ 3, 5-6, Exs. 1 (ECF 68-6), 2 (ECF 68-7), 3 (ECF 68-8); ECF 68-4

(Lewis Decl.) ¶¶ 4-6, Exs. 4 (ECF 68-9), 5 (ECF 68-10), 6 (ECF 68-11).  Plaintiffs designated Dr. Matthew Sakakeeny and Prof. Robert W. Fink as their experts and served on Defendants initial reports from both experts.  *See* ECF 73-3 (Fink Decl.) ¶ 3, Ex. 2;[1] ECF 73-4 (Sakakeeny Decl.) ¶ 2, Ex. 3.  Plaintiffs did not serve any rebuttal expert disclosures or expert rebuttal reports.  ECF 68-5 (Lamm Decl.) ¶ 6.  The parties took the depositions of Ferrara, Lewis, Sakakeeny, and Fink.  *Id.* ¶¶ 8-11, Exs. 9-13; ECF 73-2 (Fox Decl.) ¶¶ 10-13, Exs. 6-9.  The parties filed a Joint Status Report on July 8, 2024, in which Defendants averred that they intended to file an early motion for summary judgment as to the extrinsic test.  ECF 64 at 2.  Plaintiffs proffered that they intended to file "a motion." *Id.*  On July 10, 2024, the Court set a briefing schedule on the motions.  ECF 65.

On August 12, 2024, the parties timely filed Motions for Summary Judgment.  ECF 68, 69.  Defendants' Motion argues that there is no genuine dispute that Plaintiffs' claimed similarities between *Carey* and *Vance* are not protectable expression under the extrinsic test, or as a selection and arrangement of unprotectable elements.  ECF 68 at 3-4.  Plaintiffs' Motion argues that Plaintiffs are entitled to summary judgment on its copyright claims.[2]  ECF 69 at 2, 10-18; ECF 69-5.  The parties filed Oppositions on September 23, 2024, and Replies on October 15, 2024.  ECF 72, 73, 76, 77.

On October 13, 2024, Defendants file their Motion for Sanctions, requesting sanctions against Plaintiffs over the filing of their Motion for Summary Judgment.  ECF 74 at 3.  Plaintiffs filed an Opposition to the Motion for Sanctions on October 24, 2024, ECF 78, and Defendants filed a Reply on October 31, 2024, ECF 79.  On November 7, 2024, the Court held a hearing on the Motions.  ECF 80.

//

//

---

[1] Prof. Fink's declaration mistakenly states that his affirmative expert report was submitted as Exhibit 3.  ECF 73-3 (Fink Decl.) ¶ 3.  It is Exhibit 2.  *See* ECF 73-2 (Fox Decl.) ¶ 6, Ex. 2.

[2] As explained in III.B.1., Plaintiffs' Motion does not comply with the Court's Bifurcation Order.

1   ## II.    **LEGAL STANDARD**

2         Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate

3   where the movant has shown that "there is no genuine dispute as to any material fact and

4   the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Entry of

5   judgment is appropriate "if, under the governing law, there can be but one reasonable

6   conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

7   "Material facts are those which may affect the outcome of the case." *Long v. Cnty. of Los*

8   *Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006); *In re Caneva*, 550 F.3d 755, 760 (9th Cir.

9   2008); *Anderson*, 477 U.S. at 248.  "A dispute as to a material fact is genuine if there is

10  sufficient evidence for a reasonable jury to return a verdict for the non-moving

11  party." *Long*, 442 F.3d at 1185; *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010).

12        The moving party "bears the initial responsibility of informing the district court of

13  the basis for its motion, and identifying those portions of [the record], which it believes

14  demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Cartrett*,

15  477 U.S. 317, 323 (1986).  Where the moving party does not bear the burden of proof at

16  trial, it need only show that "there is an absence of evidence to support the nonmoving

17  party's case." *Id.* at 325.  Once the moving party has met this initial burden, Rule 56(c)

18  requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by

19  the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific

20  facts showing that there is a genuine issue for trial.'" *Id.* at 324; *Norse v. City of Santa*

21  *Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (en banc).  The court must grant summary

22  judgment for the moving party if the nonmoving party "fails to make a showing sufficient

23  to establish the existence of an element essential to that party's case, and on which that

24  party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

25        "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is

26  to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt*

27  *v. Cromartie*, 526 U.S. 541, 552 (1999) (quoting *Anderson*, 477 U.S. at 255); *Groh v.*

28  *Ramirez*, 540 U.S. 551, 562 (2004).  A plaintiff's claims do not survive summary judgment,

however, where merely a "scintilla of evidence" supports them. *Anderson*, 477 U.S. at 252. Rather, "there must be evidence on which the [fact finder] could reasonably find for the plaintiff." *Id.*; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (requiring more than a "metaphysical doubt" to establish a genuine dispute of material fact).

## III.    DISCUSSION

### A.    Summary Judgment

#### 1.    The Extrinsic Test

To establish copyright infringement, a plaintiff must show (1) its ownership of a valid copyright and (2) a defendant's copying of protected aspects of their work. *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020). Copying contains "two separate components: 'copying' and 'unlawful appropriation.'" *Id.* (quoting *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018)). "The hallmark of 'unlawful appropriation is that the works share *substantial* similarities." *Id.* (citing *Newton v. Diamond*, 388 F.3d 1189, 1193 (9th Cir. 2004)). To prove unlawful appropriation, a plaintiff must show that "the similarities between the two works [are] 'substantial' and . . . involve protected elements of the work." *Rentmeester*, 883 F.3d at 1117.

In determining whether the defendant's work is substantially similar to the plaintiff's copyrighted work, courts in this circuit employ a two-part test: (1) the extrinsic test and (2) the intrinsic test. *Skidmore*, 952 F.3d at 1064. The extrinsic test "compares the objective similarities of specific expressive elements in the two works," whereas the intrinsic test looks "for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance.'" *Id.* (quoting *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 637 (9th Cir. 2008)). While both tests must be satisfied for the works to be deemed substantially similar, substantial similarity under the extrinsic test can be decided at summary judgment because the test is "objective and is often resolved as a matter of law." *Gray v. Hudson*, 28 F.4th 87, 97 (9th Cir. 2022) (observing that the intrinsic test, by contrast, is "'uniquely suited for determination by the trier of fact' because of its

focus on the lay listener" (citation omitted)); *see also Morrill v. Stefani*, 338 F. Supp. 3d 1051, 1058 (C.D. Cal. 2018) (citing *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006)). Even though the court must "refrain from usurping the jury's traditional role of evaluating witness credibility and weighing the evidence, the extrinsic test requires [the court] ensure that whatever objective similarities the evidence establishes between two works are legally sufficient to serve as the basis of a copyright infringement claim regardless of the jury's view." *Gray*, 28 F.4th at 97.

"Crucially, because only substantial similarity in protectable expression may constitute actionable copying that results in infringement liability, 'it is essential to distinguish between the protected and unprotected material in a plaintiff's work.'" *Skidmore*, 952 F.3d at 1064 (quoting *Swirsky v. Carey*, 376 F.3d 841, 845 (9th Cir. 2004)). Thus, the extrinsic test requires "a three-step analysis: (1) the plaintiff identifies similarities between the copyrighted work and the accused work; (2) of those similarities, the court disregards any that are based on unprotectable material or authorized use; and (3) the court must determine the scope of protection ('thick' or 'thin') to which the remainder is entitled 'as a whole.'" *Corbello v. Valli*, 974 F.3d 965, 974 (9th Cir. 2020) (citing *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994)).

### 2. *Expert Testimony*

To aid the court in distinguishing between protectable and unprotectable expression, the extrinsic test "often requires analytical dissection of a work and expert testimony." *Morrill*, 338 F. Supp. 3d at 1058 (quoting *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000)); *accord Apple Computer*, 35 F.3d at 1443; *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1059 (C.D. Cal. 2010). Indeed, in musical infringement cases, the Ninth Circuit explicitly "require[s] parties to present expert testimony" because "[i]t is unrealistic to expect district courts to possess even a baseline fluency in musicology." *Williams v. Gaye*, 895 F.3d 1106, 1137 (9th Cir. 2018). Disclosure of expert testimony generally must be accompanied by a written report prepared and signed by the witness. Fed. R. Civ. P. 26(a)(2)(B). The report must contain, *inter alia*,

"a complete statement of all opinions the witness will express and the basis and reasons for them," "the facts or data considered by the witness in forming them," and "any exhibits that will be used to summarize or support them." *Id.* 26(a)(2)(B)(i)-(iii).

The Supreme Court firmly established the district court's role as the gatekeeper of expert testimony in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. Under Rule 702, a proponent of a witness qualified as an expert must demonstrate to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 "embodies 'the twin concerns of reliability . . . and helpfulness.'" *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007) (quoting *United States v. Mitchell*, 365 F.3d 215, 234 (3d Cir. 2004)). "Whether testimony is helpful within the meaning of Rule 702 is in essence a relevancy inquiry." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1184 (9th Cir. 2002). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation omitted). The test for reliability, however, "is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995). At base, the court must conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is

scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

a)    <u>Ferrara Reports</u>

The first of Defendants' experts, Dr. Lawrence Ferrara, was asked to conduct a comparative musicological analysis of *Carey* and *Vance*. Ferrara Decl. ¶ 3; ECF 68-6 ¶ 2. Ferrara submitted a 163-page initial report and rebuttal reports (collectively, the "Ferrara Reports"). Ferrara Decl. ¶¶ 4-6; ECF 68-6; ECF 68-7; ECF 68-8. Ferrara is a musicologist and Professor of Music and Director Emeritus of all studies in Music and the Performing Art at New York University. ECF 68-6 ¶ 1. He holds a B.A. in Music from Montclair State University, an M.M. in Music from the Manhattan School of Music, and a Ph.D. in Music from New York University. *Id.* ¶ 1, App. 1 at 42. He has authored or co-authored published books and peer-reviewed articles regarding music analysis and methodologies in music research. *Id.* He has been an active music copyright consultant for more than 30 years and given lectures on music copyright at several institutions. *Id.* The Court finds that Ferrara is qualified as a musicology expert.

*Methodology*. Ferrara analyzes (1) whether any similarities or differences are significant from a musicological perspective and (2) whether any shared similarities exist in prior art. ECF 68-6 ¶ 2. Ferrara consults audio recordings of *Carey* and *Vance*, published sheet music of *Carey*, audios and/or published sheet music of prior art, and Plaintiffs' FAC. *Id.* ¶ 4. To compare the works, he employs the following methodology: (a) analysis of *Carey* and *Vance* in their entirety, (b) analysis of each of their component elements individually and in combination, (c) analysis of prior art, and (d) analysis of *Carey* and *Vance* in their entirety within the context of the analysis of their component parts and prior art. *Id.* ¶ 5. Ferrara focuses his analyses on the following elements: (1) structure, (2) harmony, (3) rhythm, (4) melody and, when present, (5) lyrics. *Id.* ¶ 6. Ferrara describes certain other elements of a musical composition—key, tempo, meter, instrumentation, and style or genre—as less relevant to identifying significant similarities. *Id.* ¶ 2.

*Structure*.   Ferrara defines "structure" as "the organization of musical units or sections, often dictated by the development of melody and/or lyrics in songs." *Id.* ¶¶ 6(a), 7.  Ferrara provides a chart mapping the compositional structure of *Carey* and *Vance*. *Id.* ¶ 8.   Based on the chart, the only similarity between the songs is the use of standard structural sections such as Introduction, Verse, Bridge, and Outro, which he considers musical building blocks and therefore not significant structural similarities. *Id.* ¶¶ 9, 10. In contrast, Ferrara identifies several significant differences in structure. *Id.*  For example, *Carey* has a sung Introduction Verse and Introduction Chorus, while *Vance* does not. *Id.* ¶ 9.   Where Carey has three Chorus sections, one Bridge section, and no solo section, *Vance* has no Chorus section, two Bridge sections, and a solo section. *Id.*   Moreover, the Outro in *Carey* is six times longer than the Outro in *Vance*. *Id.*

*Harmony*.   Ferrara defines "harmony" as consisting of both the sequence of chords, *i.e.*, a chord progression, and harmonic rhythm, *i.e.*, the rate of change of the chords. *Id.* ¶ 50.   Ferrara observes that *Vance* is recorded in the key of A major with a modulation (*i.e.*, change of key) to B flat (Bb) major at 2:50, whereas *Carey* is recorded in the key of G major and does not have any change of key. *Id.* ¶ 52.   As part of his standard practice, Ferrara transposes the two compositions to the same key, C major, for purposes of analysis. *Id.*  He attaches his transcriptions as exhibits. *Id.*  Ferrara finds that there are no significant harmonic similarities between *Carey* and *Vance* because the chord progressions and harmonic rhythms are "very different" in both works. *Id.* ¶ 53.   In a comparative chart, Ferrara highlights as an example the harmony in the 8-bar Verse 1 of *Vance* and the harmony in bars 1-8 of the 16-bar Verse 1 in *Carey*. *Id.* ¶¶ 8, 53.  Apart from the C chord in bars 1 and 4, Ferrara found every corresponding chord was different. *Id.* ¶ 54.  He also notes, among other differences, that the harmonic rhythm differs insofar as the C chord in *Carey* does not change for 4 bars, but the C chord in *Vance* changes after only 1 beat in bar 1 and after only 2 beats in bars 3 and 4. *Id.*  Ferrara also compares the harmony in the 8-bar Bridge 1 of *Vance* and the harmony in bars 1-8 of the 16-bar Bridge of *Carey* and determines that the chord progression and harmonic rhythm are different. *Id.* ¶¶ 8, 57, 58.

Based on this analysis, Ferrara concludes that there are no significant harmonic similarities between *Carey* and *Vance*, but there are significant harmonic differences in chord progression and harmonic rhythm. *Id.* ¶ 59.

*Rhythm.* Ferrara defines "rhythm" as "the pattern and organization of the time values of sounds and silences as well as the overall rhythmic flow." *Id.* ¶¶ 6(c), 60. Ferrara states that, in general, *Vance* is a "slow ballad," while *Carey* is an "up-tempo song." *Id.* ¶ 63. He finds that *Vance* is in 12/8 meter, whereas *Carey* is in 4/4 meter, also known as "common time." *Id.* ¶ 61. He further determines that the tempo in *Vance* is 72 dotted quarter note beats per minute until approximately 3:22, compared to 150 quarter note beats per minute in *Carey* from 0:51 onward. *Id.* ¶ 62. In addition, Ferrara states that the drum rhythms are different between the two works. *Id.* ¶ 63. He concludes that there are significant rhythmic differences between *Carey* and *Vance*, not significant rhythmic similarities. *Id.* ¶ 64.

*Melody.* Ferrara defines "melody" as "a single line of music that consists primarily of a succession of pitches and the rhythmic durations of those pitches within a melodic phrase structure. *Id.* ¶¶ 69(d), 66. Ferrara gives examples of "stark" differences in vocal melodies, even in the melodic settings of the song title. *Id.* ¶¶ 67, 68. He also provides a comparative chart reflecting that the order or sequence of the scale degrees and the pitch sequences in the melody sung to the title lyric are significantly different. *Id.* ¶¶ 69-70. Ferrara determined that not a single corresponding note in *Carey* and *Vance* is the same in pitch or rhythmic duration. *Id.* ¶ 71. As for the title lyric in both works, Ferrara finds that the melodic setting is "significantly different." *Id.* ¶ 72. He concludes that "there are no significant melodic similarities, but there are very significant melodic differences" between the songs. *Id.* ¶¶ 72-73.

*Lyrics.* Ferrara observes that *Carey* and *Vance* share the same title, and the song title occurs as a lyric at the end of a structural section in each composition, as is common in popular songs. *Id.* ¶ 11. However, Ferrara notes that the title lyric occurs at the end of different structural sections: the Verse in *Vance* and the Chorus in *Carey*. *Id.* Ferrara also

notes that the general expressive idea behind the two compositions—that the narrator wishes for the object of their affection in lieu of other things for Christmas—is "normally associated with Christmas." *Id.* ¶ 12. Moreover, although both songs reference "commonplace Christmas song clichés," *id.* ¶ 13, Ferrara finds that these tropes were in common use prior to the release of *Vance* and used differently in the two works, *id.* ¶¶ 13-15. In addition, Ferrara observes that other commonplace Christmas elements appear in one song, but not the other. *Id.* ¶ 16. Other shared lyrics—such as "I don't need," "don't want," "just one thing," and "underneath the Christmas tree"—are also combined with different words and arranged differently in each song. *Id.* ¶¶ 17-25. In summary, Ferrara describes the lyrical similarities between the songs as "fragmentary, used with different lyrical phrases, arranged differently, and . . . in common use" prior to *Vance*. *Id.* ¶ 26.

As required by the extrinsic test, Ferrara also reviewed and filtered out prior art. *See* ECF 68-6 at 15-22, 31-39. Specifically, he reviewed transcriptions of 38 Christmas songs released prior to *Vance* to identify lyrical similarities between *Vance* and prior art. *Id.* ¶ 27. Ferrara found at least 19 songs predating *Vance* that incorporated the lyrical idea behind the title phrase, "All I Want for Christmas Is You." *Id.* ¶¶ 28-46. Several incorporate the exact or near identical title phrase. *See, e.g., id.* ¶¶ 28, 31-34, 39-42, 46. Because Ferrara did not identify sufficiently relevant musical similarities between *Carey* and *Vance*, he found that a search of prior art regarding any harmonies, rhythms, and melodies was not warranted.[3] *Id.* ¶ 78.

Consistent with his methodology, Ferrara considered *Carey* and *Vance* in their entirety and identified additional differences in lesser elements of musical composition, such as instrumentation and key. *Id.* ¶¶ 99-100. Based on his analysis of their component parts and prior art, Ferrara concluded that "[*Vance*] and [*Carey*] in their entirety are very

---

[3] Notably, Ferrara documented significant musical similarities between *Vance* and "My Heart Belongs Only to You," recorded by Bobby Vinton and released in 1964. ECF 68-6 ¶¶ 79-97, 105.

different songs and the only element of similarity is the use of a common lyrical idea and Christmas song clichés that were in common use prior to [*Vance*]." *Id.* ¶¶ 102, 104.

Based on the foregoing, Defendants have shown that it is more likely than not that Ferrara employed reliable principles and methods in a manner consistent with the extrinsic test, and that the Ferrara Reports reflect a reliable application of those principles and methods. *See* Fed. R. Evid. 702(c), (d). The Ferrara Reports are therefore admissible.

> b) <u>Lewis Reports</u>

The second of Defendants' experts, Professor Nathaniel Lewis, was asked to conduct a comparative analysis of the lyrics in *Carey* and *Vance*. ECF 68-9 at 6. He authored a 64-page initial report and rebuttal reports (collectively, the "Lewis Reports"). ECF 68-4 ¶¶ 4-6; ECF 68-10; ECF 68-11; ECF 68-11. Lewis is a Professor of English at Saint Michael's College, where he serves, in relevant part, as the Director of the American Studies Program and Chair of the English Department. *Id.* at 6, 58. He holds a B.A. in American Studies from Yale University, an M.A. in English from the University of North Carolina, and a Ph.D. in English from Harvard University. *Id.* His scholarship centers on the intersection of popular culture, American regionalism, constructions of place, aesthetic theory, and the written word. *Id.* at 6. He teaches undergraduate English courses, virtually all of which include the study of song lyrics. *Id.* at 6-7. The Court finds that Lewis is qualified as a literary expert.

*Methodology*. The initial Lewis Report provides a comparative literary analysis of the lyrics. Lewis treats the lyrics as literary works and considers the following literary elements: setting, theme, characters, plot, dialogue, pace, sequence of events, and mood. ECF 68-9 at 7. He draws on analytical and interpretive methodologies commonly used for prosody, versification, and poetry. *Id.* Consistent with the requirements of the extrinsic test, he appropriately filters out conventional, familiar literary devices, and other commonplace elements or ideas. *Id.* He also identifies differences in the songs' lyrics, and, in doing so, presents an objective comparative analysis of the songs' lyrics. *Id.* Lewis also presents a side-by-side diagram of the *Carey* and *Vance* lyrics. *Id.* at 8-10.

*Basic Idea*.  Lewis first considers the underlying ideas of *Carey* and *Vance* because "words or phrases in both works that flow from or are generic to an underlying idea shared by both works are less likely, if at all, to be significant." *Id.* at 11.  Lewis finds that the lyrics of both works share the basic idea that "the presence of a loved one is more important than the trappings and material gifts of the Christmas season." *Id*.  Based on a review of prior art, Lewis concludes that this theme was a popular convention of Christmas songs before the release of *Vance* in 1989.  ECF 68-9 at 11-12 (citing eight prior works reflecting the commonplace idea that love matters more than Christmas presents).  Because this theme was an established convention of Christmas songs, Lewis determines that it is not a significant similarity between *Carey* and *Vance*. *Id.* at 12.

*Words and Phrases*.  Turning to the lyrics themselves, Lewis finds that both *Carey* and *Vance* use conventional words and phrases associated with the Christmas season, but that the songs generally employ *different* seasonal words. *Id.* at 13.  Lewis provides a helpful diagram reflecting this finding.[4] *Id.* at 13-14.  As for the words that appear in both songs, Lewis identifies only five: mistletoe, Santa Claus/Santa, snow, stocking(s), and Christmas. *Id.* at 15.  Based on the etymology of each word and a comparative analysis of the lyrics, Lewis determines that these shared words are ubiquitous in Christmas songs and used differently in *Carey* and *Vance*. *Id.* at 15-21.  From a review of prior art, Lewis finds that the shared Christmas words appear in earlier songs. *Id.* at 21-23 (referencing 14 songs that use three of the five words).  Lewis concludes that the five words common to *Carey* and *Vance* are generic and not a significant similarity between the two works. *Id.* at 23.

As for phrases common to the two works, Lewis identifies two seasonal phrases— "all I want for Christmas is you" and "underneath the Christmas tree"—as well as the phrases "just one thing" and "come true" and fragments referring to "wanting" or

---

[4] Among the subtle but notable differences highlighted by Lewis is the use of "sleigh bells" in *Carey* and "sleigh rides" and "silver bells" in *Vance*.  ECF 68-9 at 14-15.  Lewis explains that it would be misleading to suggest that both songs refer to "sleighs" and "bells" because these words appear in the two songs only as constituent parts of nouns that differ significantly in meaning. *Id.* at 15.

"needing." *Id*. Lewis observes, however, that the seasonal phrases are preceded and followed by different words and expressions. *Id.* at 23-24, 26. Lewis notes 12 works released prior to 1989 that use the phrase "all I want for Christmas is you" or a slight variation of that phrase. *Id.* at 24-25. Citing additional authorities, Lewis concludes that both phrases were established elements of Christmas songs prior to 1989 and therefore not a significant similarity. *Id.* at 25-26, 26-27. Lewis also observes that expressions of wanting or needing are phrased differently in the two works and that the remaining shared phrases are sentence fragments that are commonly used in everyday speech. *Id.* at 27-34. Based on the above findings, Lewis concludes that there are no significant similarities and only significant differences between the lyrics of *Carey* and *Vance*. *Id.* at 38.

    *Additional Lyrical Elements*. Lewis also compares the setting, theme, characters, plot, sequence of events, dialogue, pace, and mood of the two works. *Id.* at 38-50. He observes that although the setting for both works is Christmastime, they reflect significantly different approaches to setting. *Id.* at 39-40 (noting that *Vance* conveys "an abstract, generalized Christmastime setting" without any depiction of place or time, whereas *Carey* is "more attentive" to setting and emphasizes the present moment). As for characters, Lewis notes that although *Carey* and *Vance* are written in the first person and present two main characters—the speaker ("I") and the addressee ("you")—these characters are commonplace, but also conveyed differently in the two works. *Id.* at 42 (stating that in *Vance*, the speaker and addressee have no defined characteristics, and their relationship is undefined, whereas in *Carey*, the speaker expresses romantic desire for the addressee, who is geographically distant). In terms of plot, Lewis states that *Vance* "presents no plot," while *Carey* "tell[s] a story." *Id.* at 44. For similar reasons, Lewis identifies differences in pace and sequence of events. *Id.* at 46-48. Lastly, as to dialogue and mood, Lewis finds that the speaker in *Vance* delivers "a series of gentle assertions of affection and abstract declarations of tenderness" in a formal, reserved tone to convey an affectionate, sincere, and warm mood. *Id.* at 46, 49. In contrast, Lewis states that the

speaker in *Carey* emphasizes yearning in a passionate, informal tone to create a more emotionally charged and dramatic mood. *Id.*

Lewis concludes that *Carey* and *Vance* "are, in terms of their lyrics, decidedly different songs sharing only generic references to Christmas tropes and commonplace words and phrases, used differently. There are no significant similarities between [*Vance*] and [*Carey*], either individually or in the two songs' lyrics as a whole." *Id.* at 50.

Based on the foregoing, Defendants have demonstrated that it is more likely than not that Lewis employed reliable principles and methods as required by the extrinsic test, and that the Lewis Reports reflect a reliable application of these principles and methods. *See* Fed. R. Evid. 702(c),(d). Accordingly, the Lewis Reports are admissible.

c)    <u>Fink Report</u>

The first of Plaintiffs' experts, Professor Robert Fink, was asked to "render a preliminary opinion as to the relationship between [*Carey*] and [*Vance*]." ECF 73-5 at 25. Fink authored an initial two-page report (the "Fink Report").[5] ECF 73-3 ¶¶ 3-4, Ex. 2 (ECF 73-5 at 24-27). He did not submit any rebuttal report. The Court finds that Fink is qualified as a musicology expert. Fink is the Special Academic Senior Associate Dean and Professor of Musicology/Music Industry at the University of California Los Angeles ("UCLA") Herb Alpert School of Music and Director of the Berry Gordy Music Industry Center at UCLA. ECF 73-3 ¶ 2. He holds a Ph.D. in Music History and Literature from the University of California, Berkeley and an M.A. in Music Theory from the Eastman School of Music at the University of Rochester. *Id.* He has taught courses on popular music at UCLA and authored two books focusing on popular music and minimal music. *Id.* His areas of study include, in relevant part, analyzing the poetic qualities of song lyrics. *Id.*

---

[5] Fink later states in his declaration that he was asked to perform "a comparative musicological analysis" of the two works. ECF 73-3 ¶¶ 3, 7. This testimony is in tension with his short, written report, titled "Preliminary report on [*Carey*] *versus* [*Vance*]," which "render[s] a preliminary opinion as to the relationship" between the two works and bases its conclusions on a "preliminary analysis." ECF 73-5 at 25, 27.

Defendants object to the admissibility of the Fink Report in its entirety on the grounds that it is irrelevant and not based upon reliable principles and methods in so far as Fink failed to apply and adhere to the extrinsic test. ECF 76-2 (Obj.) 63. The Court sustains Defendants' objection.

The Fink Report is deficient on its face. It consists of a scant six paragraphs of "preliminary" findings covering less than three pages without any supporting exhibits. *See* ECF 73-5 at 24-27. "Brevity alone does not render an expert report deficient, but [the Fink] Report is silent on too many matters to be considered either adequately supported or probative of the [only] issue [at hand]—the application of the extrinsic test." *Johannsongs-Publ'g Ltd. v. Lovland*, No. CV 18-10009-AB (SSx), 2020 WL 2315805, at *5 (C.D. Cal. Apr. 3, 2020). At the outset, Fink does not provide any explanation of the principles or methods he relied on to form his opinion. He does not disclose what materials he reviewed in making his findings, apart from a single reference to an unattached, "*preliminary* transcription" of *Carey*. ECF 73-5 ¶ 5, at 24. Nor does he provide an adequate description of the technical terms used in his analysis or their relevance. *E.g.*, *id.* at 25-26 (referring to "lyrical realizations," "musical style," "root progression," "tonal harmony," "patterns of tension and release," "scale degree," among other undefined terms). Because of these omissions, the Court has no way of determining whether the Fink Report is the product of any reliable principles and methods.

Notwithstanding the lack of any stated methodology, it is abundantly clear that Fink does not apply the principles and methods required of the extrinsic test. That is, he does not "compare[] the objective similarities of specific expressive elements in the two works." *Skidmore*, 952 F.3d at 1064. For starters, his analysis is incomplete and, in Fink's own words, "preliminary." ECF 73-5 at 27 (speculating on what "detailed analysis" may or may not reveal); *see also* ECF 68-5 (Lamm Decl.) ¶ 4, Ex. 9 (Fink Depo.) at 174:13-15 ("A. This is a preliminary report so I don't consider this definitive in terms of prior art. Q. Why did you not prepare a full report? A. I wasn't asked to do so."). Indicative of this lack of comprehensiveness, Fink provides a single diagram comparing the melody and

harmony of only the lyrical hook, "All I want for Christmas is You," without any "melodic-harmonic" comparison of the remainder of the compositions. ECF 73-5 ¶ 5, fig. 1. With respect to even this limited comparison, Fink claims a similarity in the hook melodies based on four corresponding pitches, but critically ignores the *rhythmic organization* of those pitches. *See id.* It is well-settled and undisputed that a melody "involves more than writing down a sequence of pitches; at a minimum, that sequence must also be 'rhythmically organized' so as to form an 'esthetic whole.'" *Gray*, 28 F.4th at 99 (citation omitted); *see* ECF 73 at 25. Fink later admitted at his deposition that the rhythmic organization is different. Fink Depo. at 158:4-159:15 ("A. I will say I don't think there is any way that I would notate that, if I was going to use notation, where I could make the numbers line up . . . . the rhythms are different.").

Fink also bases his conclusions on the inverse ratio rule, which required "a lower standard of proof of substantial similarity when a high degree of access [to the protected work] is shown." *Skidmore*, 952 F.3d at 1065-66 (quoting *Three Boys*, 212 F.3d at 486-87). He states in his report that a claimed similarity would be significant "given . . . *a strong case for access*." ECF 73-5 ¶ 6, at 26 (emphasis added). *Skidmore* explicitly abrogated the inverse ratio rule in this circuit, explaining: "Because the inverse ratio rule, which is not part of the copyright statute, defies logic, and creates uncertainty for the courts and the parties, we take this opportunity to abrogate the rule in the Ninth Circuit and overrule our prior cases to the contrary." *Id.* at 1066. In so holding, the Ninth Circuit "join[ed] the majority of [its] sister circuits that have considered the inverse ratio rule and have correctly chosen to excise it from copyright analysis." *Id.* at 1069. The court clarified that it is "not suggesting that access cannot serve as circumstantial evidence of actual copying in all cases; *access, however, in no way can prove substantial similarity*." *Id.* (emphasis added).

Moreover, the Fink Report lists random, isolated lyrical (and other elemental) similarities in the two compositions without putting those similarities into the context of the entire compositions. *E.g.*, ECF 73-5 ¶ 1, at 25 ("Many images and phrases are carried

over from [*Vance*] to [*Carey*] including 'mistletoe' and 'Santa,' 'sleigh bells' and 'snow,' 'asking' for something, the phrase 'I don't want' or 'I don't need,' a 'dream' or a 'wish' that might 'come true,' the exact phrase 'underneath the Christmas tree,' and, of course, the exact title phrase '*All I want for Christmas is you*.'"). But "'lists of similarities' are 'inherently subjective and unreliable,' especially where," as here, "they 'emphasize . . . random similarities scattered throughout the works.'" *Olson v. Nat'l Broad. Co., Inc.*, 855 F.2d 1446, 1450 (9th Cir. 1988) (quoting *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984)).

Critically, Fink does not distinguish between protected and unprotected material as required under the extrinsic test. *See Skidmore*, 952 F.3d at 1064 ("[I]t is essential to distinguish between the protected and unprotected material in a plaintiff's work." (citation omitted)). Fink claims similarities in elements that he admits are commonplace, which means they are unprotected. For example, he observes that many of the images and phrases conjured by the lyrics are "conventional Christmas trappings" and "traditional seasonal images." ECF 73-5 ¶¶ 1, 2. Instead of ignoring these commonplace tropes as required under the extrinsic test, Fink explicitly relies on them in concluding that "the piling up of substantially similar turns of phrase is striking." *Id.* ¶ 2. It is undisputed that Fink did not search for prior art before rendering his opinion. ECF 71 ("P-SGD") 5. Because he did not consider any prior art, Fink's comparison of *Carey* and *Vance* "fail[s] to filter out unprotectable prior art elements, which is the foundation of the extrinsic test." *Johannsongs-Publishing Ltd. v. Lovland*, 2020 WL 2315805, *aff'd,* No. 20-55552, 2021 WL 5564626 (9th Cir. Nov. 29, 2021) (holding that the district court did not abuse its discretion in excluding expert report for "fail[ing] to filter out similarities that are attributable to prior art, as required under the extrinsic test"). Because Fink did not compare the works in the manner required, his opinions about the similarities between the works are "legally deficient and irrelevant" as to the extrinsic test. *Id.*; *see also Yonay v. Paramount Pictures Corp.*, No. CV 22-3846 PA (GJSX), 2024 WL 2107721, at *3 (C.D.

Cal. Apr. 5, 2024) (finding that expert's failure to filter out unprotected elements "render[ed] his opinions unhelpful and inadmissible").

Based on the foregoing, the Court finds that the Fink Report is not based on sufficient facts or data, is not the product of reliable principles and methods, and does not reflect a reliable application of the principles and methods required by the extrinsic test. *See* Fed. R. Evid. 702. The Court deems the Fink Report inadmissible.

d)    <u>Sakakeeny Report</u>

The second of Plaintiffs' experts, Dr. Matthew Sakakeeny, was asked to perform "a comparative musicological analysis" of *Carey* and *Vance*. ECF 73-4 ¶ 2. He authored an eight-page initial report, dated July 11, 2022 (the "Sakakeeny Report"). *Id.* ¶ 2, Ex. 3 (ECF 73-5 at 28-38). He did not submit any rebuttal report. The Court finds that Sakakeeny is qualified as a musicology expert. He is an Associate Professor of Music at Tulane University and holds a Ph.D. in Musicology from Columbia University and an M.A. in Musicology from Tulane University. ECF 73-4 ¶ 1 (sic). He has authored three books on the study of music and written several articles and book chapters. *Id.* He teaches courses on, among other topics, sound studies, Black music and Black lives, and music and politics. *Id.* His areas of study include analyzing and historicizing American popular music as well as analyzing the sonic properties of music and poetic qualities of song lyrics in American popular music. *Id.*

Defendants object to the admissibility of the Sakakeeny Report in its entirety on the grounds that it is (1) irrelevant in this initial phase as to the extrinsic test and (2) not based on reliable principles and methods, in so far as Sakakeeny failed to apply and adhere to the extrinsic test. Obj. 96.

Unlike the Fink Report, the Sakakeeny Report describes some principles and methods of analysis. Specifically, it is organized into five sections to compare the following musical elements in order of importance: (1) lyrics, (2) primary melody or "hook," (3) overall melody and phrasing, (4) harmony, and (5) rhythm. ECF 73-5 at 29. Nevertheless, it suffers from similarly obvious deficiencies that render it inadequately

supported.  *See Johannsongs*, 2020 WL 2315805, at \*5.  As with the Fink Report, several of the musical elements are left undefined, and their relevance unexplained.  *E.g.*, *id.* at 32 (referring to, among other undefined elements, "harmonic background," "rhythmic placement and emphasis," "the overall 'contour' or direction of the melody," and "harmonic language").  And apart from vaguely referencing prior art and the sheet music, *see* ECF 73-5 at 29, 35-36, it is unclear what materials Sakakeeny reviewed and relied upon before rendering his opinion.  Thus, while the Sakakeeny Report contains some semblance of methodology, the Court still strains to ascertain the reliability of the methods and principles employed.

What is clear is that Sakakeeny did not reliably apply the extrinsic test as required.  Again, essential to the extrinsic test is the need to distinguish between protected and unprotected material.  *See Skidmore*, 952 F.3d at 1064.  Far from filtering out unprotected materials, Sakakeeny claims similarities in elements that he freely admits are commonplace.  *E.g.*, ECF 73-5 at 33 (acknowledging that the C-minor chord used in both works is "referred to as the 'Christmas chord' and on its own is not unusual") and 34 (conceding that "many Christmas songs use comparable rhythms and meters").  It is also undisputed that Sakakeeny did not analyze any prior art before rendering his opinion.  P-SGD 6; *see also* ECF 68-5 ¶ 8, Ex. 10 (Sakakeeny Depo.) at 116:11-15, 196:19-23.  Sakakeeny makes a passing reference to prior art, acknowledging that "[t]here are works by the same title that predate [*Vance*]," ECF 73-5 at 1, and concludes without any explanation that "[*Vance*] does not 'recycle' lyrical phrases or storylines of the previous songs with anywhere near the consistency that [*Carey*] does with [*Vance*]," *id.*  But that is not the kind of analysis that is "legally relevant"—Sakakeeny "does not *filter out* elements of these prior art songs from [*Carey*] and [*Vance*] and compare the remainder as the case law requires."  *Johannsongs-Publ'g Ltd. v. Lovland*, No. CV 18-10009-AB (SSX), 2020 WL 2315805, at \*6 (C.D. Cal. Apr. 3, 2020).  "[T]he point is to *eliminate* the non-protectible prior art components from the songs in issue, and then compare the protectable remainder, to see how similar that protectible remainder is.  A comparison that includes

both unprotectible and protectible elements is invalid under the extrinsic test and is legally irrelevant." *Id.*; *see also Yonay*, 2024 WL 2107721, at *3; *Knowles v. Spin Master, Inc.*, No. CV 18-5827 PA (JCX), 2019 WL 4565102, at *4 (C.D. Cal. Sept. 17, 2019).

Several conclusions made in the Sakakeeny Report are also based on unreliable factual assertions. For instance, Sakakeeny concludes that "[t]here are an enormous number of similarities in the lyrics between the two works. Based on the included chart, 50% of the lyrics in [*Vance*] were copied or modified ("recycled") in [*Carey*]." ECF 73-6 at 29, 32. But the chart reflects that Sakakeeny included in his estimation of similarities lyrics that are in fact different. *E.g.*, *id.* at 30 (highlighting "[s]ilver bells" and "sleigh rides" in *Vance* and "sleigh bells" in *Carey*), 30-31 (highlighting "Santa can't bring me what I need" in *Vance* and "Santa, won't you bring me the one I really need?" in *Carey*). Sakakeeny even conceded at his deposition that the lyrics chart contains errors and alterations to the songs' lyrics. Sakakeeny Depo. at 56:4-17 ("Q. Do you agree that this singer, in the last three lines, sings the lyrics "'cause all I want for Christmas is you; 'cause all I want for Christmas is you"? A. Yeah. Q. And why was that word "'cause'" omitted from those lines in your report? A. For two reasons . . . . But *I think if you wanted to accurately transcribe it, you could include the – you would include the "'cause"* (emphasis added)), 57:6-19 ("Q. In Bridge 1 and Bridge 2 do you see the lines that you've transcribed as "all that I want can be found"? A. Yes, I do. . . . Q. In Measure 21 you write that lyric as "it can't be found"; do you see that? A. Yes, that is the correct transcription. I made an error in the section you were referring to earlier.").

Sakakeeny also states his opinion on issues that are wholly irrelevant to the extrinsic test, such as "the likelihood that Carey had access to [*Vance*] prior to the composition of her work." ECF 73-5 at 29, 34. Not only was Sakakeeny not designated as an expert on access, but it is also well-settled that access is irrelevant to determining objective similarities in protected expression. *See Skidmore*, 952 F.3d at 1069 ("[A]ccess, however, in no way can prove substantial similarity."). He also speculates on originality, another irrelevant element, claiming that "the original words in [*Carey*] are simply additive to what

originally appeared in [*Vance*] (e.g. presents, fireplace, toy, reindeer, lights) and thus not wholly original." *Id.* at 32. Sakakeeny also assumes copying, "estimat[ing] that 50% of the lyrics in [*Vance*] were copied or modified ("recycled") in [*Carey*]" and stating without analysis that *Vance* "does not 'recycle lyrical phrases or storylines of the previous songs with anywhere near the consistency that [*Carey*] does with [*Vance*]." ECF 73-5 at 29. The inclusion of this irrelevant analysis obfuscates the issues and undermines the reliability of Sakakeeny's testimony.

Lastly, as with the Fink Report, the Sakakeeny Report claims similarities in isolation and fails to put those elements "in the context of the entire compositions." *Johannsongs*, 2020 WL 2315805 at *5-6 (granting summary judgment against plaintiff where plaintiff's expert "tallie[d] up the number of similarities and conclude[d] that there are more similarities between" the two works than in prior art). As explained above, this methodology is "inherently subjective and unreliable" because it "emphasize[s] random similarities scattered throughout the works," not similarities in protected expression. *Olson*, 855 F.2d at 1450 (citation omitted).

Plaintiffs have not demonstrated that it is more likely than not that the Sakakeeny Report is the product of reliable principles or methods required of the extrinsic test and reflects the reliable application of those principles and methods. Because Sakakeeny does not reliably apply the extrinsic test, his report is legally irrelevant as to the sole issue before the Court. Accordingly, the Court excludes the Sakakeeny Report.

e) <u>Fink and Sakakeeny Declarations</u>

Defendants object to Fink's declarations (the "Fink Declarations") and Sakakeeny's declarations (the "Sakakeeny Declarations") on the grounds, among others, that (1) the declarations fail to apply the extrinsic test and therefore are irrelevant and inadmissible and (2) portions of their declarations and attached exhibits constitute untimely rebuttal and sur-rebuttal opinions that should be disregarded. Objs. 95, 103, 105-15, 118-19, 124-25. The Court sustains these objections.

The Fink Declarations and Sakakeeny Declarations primarily reiterate conclusions made in the Fink Report and the Sakakeeny Report, respectively. ECF 69-3 ¶¶ 5-6, 8-13; ECF 73-3 ¶¶ 5-6, 8-13; ECF 69-4 ¶¶ 5-6, 8-15; ECF 73-4 ¶¶ 4-7, 21-23, 28. Having found that the Sakakeeny Report and Fink Report are inadmissible for reasons explained above, the Court concludes that these portions of the Fink and Sakakeeny Declarations are inadmissible.

The Fink and Sakakeeny Declarations also purport to respond to Ferrara's and Lewis' testimony. *E.g.*, ECF 73-3 ¶ 14-18; ECF 73-4 ¶¶ 8-15. Sakakeeny even attaches to his latest declaration certain "Independent Research" that was not included in his initial report and produced just prior to and even *during* his deposition, well past the rebuttal expert disclosure deadline. ECF 73-4 ¶ 8; ECF 76-3 (Lamm Reply Decl.) ¶¶ 4-7 (reflecting that Defendants' counsel received portions of the "Independent Research" on the eve of Sakakeeny's deposition and during the deposition, that Sakakeeny revised the "Independent Research" during the deposition, and that Defendants' counsel objected to the "Independent Research" at the deposition as an untimely rebuttal report).

It is well-settled that "[a] party must submit its expert witness disclosures 'at the times and in the sequence that the court orders.'" *Luke v. Fam. Care & Urgent Med. Clinics*, 323 Fed. App'x 496, 498 (9th Cir. 2009) (citing Fed. R. Civ. P. 26(a)(2)(C)); *see also Wong v. Regents of Univ. of California*, 410 F.3d 1052, 1058, 1060 (9th Cir. 2005). A responding party is "entitled to a *complete* disclosure of all opinions" by the court-ordered deadlines, "not a sneak preview of a moving target." *Mariscal v. Graco, Inc.*, 52 F. Supp. 3d 973, 983-84 (N.D. Cal. 2014) (excluding expert opinion offered for the first time at summary judgment). "Although Rule 26(e) obliges a party to supplement or correct its disclosures upon information later acquired, this does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report." *Id.* (quoting *Plumley v. Mockett*, 836 F. Supp. 2d 1053, 1062 (C.D. Cal. 2010)). Under Rule 37(c)(1), untimely expert opinions and supporting materials must be excluded unless the propounding party can meet their burden of showing that their failure was either

"substantially justified" or "harmless." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).

The Court's Bifurcation Order required Plaintiffs to submit rebuttal reports by June 3, 2024.[6] *See* ECF 58. They did not. Now, months past the deadline, Plaintiffs inexplicably attempt to rehabilitate their witnesses by having them respond in their declarations to the Ferrara and Lewis Reports. Plaintiffs make no showing that their failure to timely disclose expert testimony was substantially justified or harmless. Plaintiffs only lament that "[d]ue to time constraints on the experts, the expert depositions stood in for any rebuttal report." P-SGD 4. The Court is not moved by such excuses. Depositions are not rebuttal disclosures. "A party's inability to prepare an expert report within the discovery and expert disclosure deadlines set forth in a scheduling order does not excuse compliance with the requirements of Rule 26(a)(2)(B)." *Wilderness Dev., LLC v. Hash*, No. CV 08-54-M-JCL, 2009 WL 564224 (D. Mont. Mar. 5, 2009) (citing *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 (7th Cir. 1998)). Plaintiffs could have, but did not file a motion to extend the rebuttal deadline, and their failure to do so "amounts to nothing more than poor case management and lack of care and due diligence." *Pineda v. City & Cnty. of San Francisco*, 280 F.R.D. 517, 521 (N.D. Cal. 2012). Moreover, that these rebuttals were inserted into the experts' later-filed declarations in support of Plaintiffs' Opposition, but *not* their earlier-filed declarations in support of Plaintiffs' *own* Motion for Summary Judgment, tells a clear tale of too little, too late. *Compare* ECF 69-3 *and* ECF 69-4 *with* ECF 73-3 *and* ECF 73-4.

The Court concludes that the Fink Declarations and the Sakakeeny Declarations are a product of unreliable and unhelpful expert testimony and untimely rebuttal testimony. Accordingly, the Court excludes the Fink and Sakakeeny Declarations.

---

[6] Plaintiffs also argue that rebuttal reports are permissible, not mandatory. *See* P-SGD 4. This ignores the unambiguous language of the Court's Bifurcation Order, which ordered that "the parties *shall* exchange [Rule] 26(a)(2) rebuttal expert disclosures as to the extrinsic test." ECF 53 at 3 (emphasis added). "Shall" means <u>must</u>, not may or should.

Based on the foregoing, Plaintiffs have not met their burden of showing that *Carey* and *Vance* are substantially similar under the extrinsic test.[7]  Because Fink and Sakakeeny's testimony is not admissible, the well-supported conclusions made in the Ferrara Reports and the Lewis Reports are effectively unrebutted and not genuinely disputed.  A plaintiff who fails to satisfy the extrinsic test cannot survive summary judgment on a copyright claim.  *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 624 (9th Cir. 2010).  Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment and **DENIES** Plaintiffs' Motion for Summary Judgment.

## B. <u>Request for Sanctions</u>

Federal Rule of Civil Procedure 11 is "intended to deter baseless filings in district court and imposes a duty of 'reasonable inquiry' so that anything filed with the court is 'well grounded in fact, legally tenable, and not interposed for any improper purpose.'" *Islamic Shura Council of S. Cal. v. F.B.I.*, 757 F.3d 870, 872 (9th Cir. 2014) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990)); *see also* Fed. R. Civ. P. 11(b)(1)-(3).  "A district court may impose Rule 11 sanctions if a paper filed with the court is for an improper purpose, or if it is frivolous."  *G.C. & K.B. Invs., Inc. v. Wilson*, 326 F.3d 1096, 1109 (9th Cir. 2003) (citing Fed. R. Civ. P. 11(b)(1)-(2)).  Improper purposes include to "harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 11(b)(1).  A frivolous filing is one that is "both baseless and made without a reasonable and competent inquiry" into the law and facts.  *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990).  "The standard governing both the 'improper purpose' and 'frivolous' inquiries is objective."  *G.C. & K.B.*, 326 F.3d at 1109;

---

[7] In their Opposition, Plaintiffs contend that even if certain elements are individually unprotected, the claimed similarities are still protectable as a selection and arrangement. ECF 73 at 16-19.  Yet despite discussing at length case law relevant to a selection and arrangement theory, Plaintiffs "fail[] to apply it in any way and therefore ha[ve] failed to pursue this theory." *Johannsongs*, 2020 WL 2315805, at *7.  Tellingly, Plaintiffs do not advance a selection and arrangement theory in their *own* Motion for Summary Judgment. *See* ECF 69.

*see also Smith v. Ricks*, 31 F.3d 1478, 1488 (9th Cir. 1994) (explaining that sanctions cannot be avoided "by operating under the guise of a pure heart and empty head" (citation omitted)).  "The 'reasonable man' against which conduct is tested is a competent attorney admitted to practice before the district court." *Id.* (quoting *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 830 (9th Cir. 1986)).

Here, Defendants argue that Plaintiffs' filing of their Motion for Summary Judgment (hereinafter, the "Motion") is sanctionable because the Motion is frivolous and brought for an improper purpose.  ECF 74-1 at 13-24.  Plaintiffs oppose, contending that their claim is not frivolous, and their Motion was not presented for an improper purpose.  ECF 78 at 7-12.

### 1. **Safe Harbor**

Rule 11's safe harbor provision provides that a motion for sanctions "must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service." Fed. R. Civ. P. 11(c)(2).  The safe harbor "is meant to give litigants an opportunity to remedy any alleged misconduct before sanctions are imposed." *Truesdell v. S. Cal. Permanente Med. Grp.*, 293 F.3d 1146, 1151-52 (9th Cir. 2002) (citation omitted).  "After 21 days, if the offending party has not withdrawn the filing, the movant may file the Rule 11 motion with the court." *Id.*

Defendants "strictly complied" with the safe harbor provision, as mandated by the Ninth Circuit. *Islamic Shura Council*, 757 F.3d at 872.  On September 23, 2024, Defendants served a copy of its then-contemplated Motion for Sanctions on Plaintiffs, along with a cover letter advising Plaintiffs that they had 21 days (until October 14, 2024) to remedy the alleged violations under the safe harbor.  ECF 74-2 (Anderson Decl.) ¶ 3, Ex. 1.  On October 7, 2024, prior to the filing of the Motion for Sanctions, the parties' counsel held a Local Rule 7-3 conference, at which Plaintiffs' counsel indicated that it would withdraw certain arguments subject to the Motion for Sanctions, namely as to ownership and access. *See* ECF 79 at 7-8.  Yet Plaintiffs only withdrew these arguments

in their Reply on October 15, 2024, after the safe harbor period had lapsed and Defendants had filed the Motion for Sanctions earlier the same day. *See* ECF 77 at 2. With arguments on access and copying withdrawn, Plaintiffs' Motion for Summary Judgment devotes a scant three pages to the extrinsic test. ECF 69 at 15-18. Even so, the Court finds that the remainder is also frivolous for reasons discussed below.

### 2. *Sanctionable Conduct*

"An order imposing a sanction must describe the sanctioned conduct and explain the basis for the sanction." Fed. R. Civ. P. 11(c)(6). The Court finds that the conduct described herein is sanctionable pursuant to Rule 11(b)(1) through (3).

### a) <u>Non-Compliance with the Bifurcation Order</u>

The parties agreed that bifurcation would be "the most judicially efficient way to manage this litigation" because "[i]t would provide the parties an early opportunity to determine a dispositive issue[.]" ECF 53 at 2. Consistent with this shared understanding, the Court ordered the parties to conduct discovery and file motions for summary judgment *as to the extrinsic test <u>only</u>*. *Id.* at 3. The Court stayed all other discovery. *Id.*

Despite the parties' agreement and the Court's clear instructions, Plaintiffs, by and through their counsel, inexplicably moved for summary judgment on other elements of their copyright claim, *i.e.*, ownership, copying, and access. *See* ECF 69 at 10-15. Plaintiffs' counsel offers **no** explanation for failing to comply with the Bifurcation Order. Counsel claims that any reference to issues outside of the extrinsic test was "intended only as background." ECF 78 at 6. This explanation strains credulity. Plaintiffs' Motion devotes an entire section of the *argument*—not background—to the issues of ownership, copying, and access. *See* ECF 69 at 10-15. Tellingly, Plaintiffs' proposed order granting their Motion requests a finding that "[t]here are no genuine issues of material fact *as to Plaintiffs' First and Second Causes of Action in the Complaint*," ECF 69-5 at 2 (emphasis added), not just as to substantial similarity under the extrinsic test. This requested relief defies logic considering the parties have not had an opportunity to conduct fact discovery as to those elements. Plaintiffs' failure to comply with the Bifurcation Order is clear

evidence of Plaintiffs' improper purpose in filing for summary judgment.  Plaintiffs' counsel, as an officer of the Court, is at fault for this non-compliance.  Instead of timely remedying this misconduct, Plaintiffs' counsel delayed and needlessly caused Defendants to oppose irrelevant factual and legal issues that are not properly before the Court.

> b)  <u>Frivolous Contentions of Law</u>

Defendants argue that Plaintiffs' legal arguments are frivolous because they are based on overruled points of law and are otherwise not colorable.  ECF 74-1 at 14-15.  Plaintiffs do not meaningfully respond to Defendants' arguments, but nevertheless insist that the Motion contains "legitimate arguments."  ECF 78 at 9.

Rule 11 imposes a non-delegable, "affirmative duty" upon the attorney to conduct a reasonable inquiry into the law before filing a motion.  *Lloyd v. Schlag*, 884 F.2d 409, 412 (9th Cir. 1989).  Plaintiffs' counsel did not uphold this duty.  As an initial matter, Plaintiffs submitted legal arguments on elements wholly irrelevant to the extrinsic test.  *See* ECF 69; *cf.* ECF 53.  Although Plaintiffs later withdrew these arguments, ECF 77, Plaintiffs' Motion is nevertheless frivolous within the meaning of Rule 11 as to the extrinsic test.  The Court agrees with Defendants that Plaintiffs' Motion is predicated on an abrogated legal rule: that "substantial similarity is inextricably linked to the issue of access."  ECF 69 at 11 (citing *Skidmore*, 952 F.3d at 1065-66).  As explained above, the very case cited by Plaintiffs expressly *abrogated* this rule.  *Skidmore*, 952 F.3d at 1069 ("Because the inverse ratio rule, which is not part of the copyright statute, defies logic, and creates uncertainty for the courts and the parties, we take this opportunity to abrogate the rule in the Ninth Circuit and overrule our prior cases to the contrary.").  A reasonably diligent review of *Skidmore* would have made clear that access "in no way can prove substantial similarity" in this circuit.  *Id*.  Plaintiffs' reliance on *Skidmore* for a legal proposition *abrogated by that case* is as clear an indication as any that Plaintiffs' counsel did not conduct a reasonable inquiry into the law prior to filing the Motion.

Plaintiffs make no attempt to square their misstatement of the law.  In fact, they double down on outdated legal standards and overruled authorities in their Reply.  They

once more assert, without any legal support, that "[t]he question of 'access' is encompassed under the 'copying' element, along with substantial similarity[.]"  ECF 77 at 2.  That is not so.  *See Skidmore*, 952 F.3d at 1064 (explaining that copying and unlawful appropriation, which includes substantial similarity, are "separate components").  Plaintiffs further claim that "[u]nder *Krofft*, if the extrinsic test reveals similarities in ideas, the court proceeds to the . . . intrinsic test."  ECF 77 at 2 (citing *Sid & Marty Krofft Tel. Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1165 (9th Cir. 1977)).  This has not been the law of this circuit for over 30 years.  It is true that in *Krofft*, the Ninth Circuit initially conceived of the extrinsic test as a "test for similarity of ideas" and the intrinsic test as a test of similarity "in the expression of the ideas."  562 F.2d at 1164.  But the Ninth Circuit has long since rejected this formulation, holding instead that "the line [between the extrinsic and intrinsic tests] is more properly drawn between objective and subjective analyses of expression," not ideas.  *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1473-74 (9th Cir. 1992) (citing *Shaw v. Lindheim*, 919 F.2d 1353, 1357 (9th Cir. 1990)).  That is because "[i]n no case does copyright protection . . . extend to any idea."  17 U.S.C. § 102(b); *see also Skidmore*, 952 F.3d at 1069 ("[C]opyright *does* require at least a modicum of creativity and does not protect . . . ideas, concepts, and common elements[.]").  Plaintiffs' continued reliance on abrogated legal principles confirms that Plaintiffs' counsel failed to conduct a reasonable inquiry into the law.

c)  <u>Unsupported Statements of Fact</u>

Defendants argue that Plaintiffs' Statement of Uncontroverted Facts ("SUF") are improper because they violate the Local Rules and "simply copy-and-paste[]" conclusory allegations from the FAC.  ECF 74-1 at 17-18.  They further contend that Plaintiffs' factual contentions lack any evidentiary basis.  *Id.* at 18-22.  Plaintiffs accuse Defendants of "hammering on Plaintiffs' inclusion of facts unrelated to the extrinsic test" and "misstating the background information which Plaintiffs did not include for any nefarious purpose[.]"  ECF 78 at 10-12.

The Court agrees with Defendants that the Plaintiffs' SUF violates the Local Rules and is procedurally improper.  The Local Rules require parties moving for summary judgment to "set forth the material facts as to which the moving party contends there is no genuine dispute" with each fact "supported by pinpoint citations (including page and line numbers, if available) to evidence in the record." L.R. 56-1.  Several of the purported facts set forth in Plaintiffs' SUF are supported only by Plaintiffs' FAC or statements made in conclusory declarations accompanying the Motion, *not* evidence in the record.  *See, e.g.,* ECF 69-1 (P-SUF) 1-14, 24-25, 27-34, 36-43, 66-69.  Plaintiffs also fail to pin cite *any* of the evidence supporting their purported facts.  *See generally* P-SUF 16-69.

Plaintiffs explain that they included background facts from their pleading "for the simple purpose of providing a historical context of the two works . . . . There is no reason to sanction a party for including more, rather than less, factual information." ECF 78 at 11.  As explained above, most facts derived from the FAC are cited in support of irrelevant arguments on copying, not as background.  *See* ECF 69 at 11-13 (citing P-SUF 24-25, 27-34, 36-43).  Further, irrelevant and unsupported allegations in a pleading are *not material facts* at summary judgment and therefore do not belong in a statement of uncontroverted *facts*.  The Court finds that these deficiencies alone are sanctionable under the Local Rules.  *See* L.R. 83-7(a)-(b).

Were that all, the Court would hesitate to find such conduct sanctionable under Rule 11.  But as Defendants note, many of the other claimed facts are also "vague, compound, and incomprehensible mixtures of factual assertions and conclusions, subjective opinions, and other irrelevant evidence." ECF 74-1 at 17 (citing P-SUF 2, 5, 6, 8-14, 24-25, 27-34, 36-43, 47-64, 66-69).  For example, Plaintiffs' Fact 10 states, without any evidentiary support, that "Defendants undoubtedly had access to [*Vance*] prior to writing and releasing [*Carey*] given its wide commercial and cultural success," P-SUF 10, even though access was not at issue in this initial phase as to the extrinsic test.  Similarly, Fact 68 cites Sakakeeny's declaration for the bald proposition that "Carey would have had ample access to [*Vance*]," P-SUF 68, despite Sakakeeny's admission that he was never designated as an

expert on the factual issue of copying, ECF 69-4 ¶ 7.  Although Plaintiffs withdrew certain legally irrelevant arguments in their Reply, Plaintiffs did not withdraw numerous irrelevant facts in their Response to Statements of Genuine Dispute ("RSGD").  *See generally* ECF 77-1.  At Fact 68, for instance, Plaintiff responds, "As to the disputed portion, Plaintiff (sic) respectfully refers to Sakakeeny Decl."  *Id.* 68.  The RSGD is replete with this type of perfunctory response.  *E.g.*, *id.* 7-9, 12, 19, 23-29, 32-43, 50-68.  The Local Rules clearly provide that for facts disputed by the opposing party, the moving party's response must include "pinpoint citations including page and line numbers, if available, to evidence in the record . . . to rebut the existence of a genuine dispute."  L.R. 56-3.

It is clear to the Court that Plaintiffs' counsel made no reasonable effort to ensure that the factual contentions asserted have evidentiary support.  Thus, the litany of irrelevant and unsupported factual assertions reflected in Plaintiffs' SUF and RSGD has served only to confuse the Court and the parties.

***

Based on the foregoing, the Court finds that Plaintiffs, by and through their counsel, presented their Motion for an improper purpose, specifically to cause unnecessary delay and needlessly increase the costs of litigation, and that their Motion is "both baseless and made without a reasonable and competent inquiry" into the law and facts.  *Townsend*, 929 F.2d at 1362.  Plaintiffs' counsel is at fault for the offending conduct.  Indeed, in filing a motion for summary judgment, a reasonable attorney would not have blatantly disregarded the Court's Bifurcation Order, raised frivolous legal arguments, and cited irrelevant and unsupported statements of fact.  *See G.C. & K.B.*, 326 F.3d at 1109.

### 3.    *Nature of Sanctions*

If the Court "determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation."  Fed. R. Civ. P. 11(c)(1).  Sanctions can include "nonmonetary directives," a penalty payable to the court, and "payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the

violation." Fed. R. Civ. P. 11(c)(1). "[T]he central purpose of Rule 11 is to deter baseless
filings." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990). Thus, any Rule 11
sanction "must be limited to what suffices to deter repetition of the conduct or comparable
conduct by others similarly situated." *Id.* 11(c)(4); *see also In re Yagman*, 796 F.2d 1165,
1184 (9th Cir. 1986) ("It is critical . . . that the sanctioning court embrace the overriding
purpose of deterrence and mold its sanctions in each case so as to best implement that
policy."). Sanctions should also be imposed "only in the most egregious situations, lest
lawyers be deterred from vigorous representation of their clients." *United Nat'l Ins. Co. v.
R&D Latex Corp.*, 242 F.3d 1102, 1115 (9th Cir. 2001).

If requested by motion and warranted for effective deterrence, Rule 11 authorizes
the Court to issue "an order directing payment to the movant of part or all of the reasonable
attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P.
11(c)(4). However, "Rule 11 provides for sanctions, not fee shifting. It is aimed at
deterring, and, if necessary punishing improper conduct rather than merely compensating
the prevailing party." *United States ex rel. Leno v. Summit Const. Co.*, 892 F.2d 788, 790
n.4 (9th Cir. 1989); *see also Truesdell v. S. Cal. Permanente Med. Grp.*, 209 F.R.D. 169,
175 (C.D. Cal. 2002).

Defendants request that the Court impose sanctions in the amount of reasonable
attorney's fees that Defendants incurred in preparing their Opposition to Plaintiffs' Motion
and their Motion for Sanctions. ECF 74-1 at 24. Although each incident of sanctionable
conduct, in isolation, may not warrant more than a stern reprimand, it is the aggregate of
misconduct reflected in Plaintiffs' Motion that makes this an egregious situation warranting
more severe sanctions. Defendants have demonstrated that the requested fees are "a direct
result of the offending conduct." *Truesdell*, 209 F.R.D. at 175. Plaintiffs' Motion
prompted Defendants to incur needless expenses responding to frivolous legal arguments
and unsupported factual contentions. The Court finds that the punitive and deterrent ends
of Rule 11 are best served by imposing sanctions in the amount of some or all attorneys'
fees incurred by Defendants in preparing their Opposition to Plaintiffs' Motion.

Accordingly, the Court **GRANTS** Defendants' Motion for Sanctions and **ORDERS** Defendants to file within **14 days** of this Order a motion to determine the amount of reasonable attorneys' fees to be awarded.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion for Summary Judgment and Motion for Sanctions is **GRANTED**. Plaintiffs' Motion for Summary Judgment is **DENIED**. The Court further **ORDERS** Defendants to file within **14 days** of the date of this Order a proposed judgment and a motion for attorneys' fees reasonably incurred in preparing their Opposition to Plaintiffs' Motion and the Motion for Sanctions.

**IT IS SO ORDERED.**

Dated: March 19, 2025

_____
HON. MÓNICA RAMÍREZ ALMADANI
UNITED STATES DISTRICT JUDGE